OPINION
Eldon G. Draper was indicted by a Franklin County grand jury on June 19, 2000, charged with two counts of aggravated arson as felonies of the first degree; two counts of aggravated arson as felonies of the second degree; and, one count of arson as a felony of the fourth degree. A warrant was issued for his arrest.
The indictment alleged separate fire-related offenses occurring in both May of 1996 and then some four years later in May 2000. The details of the allegations are discussed fully in our discussion of the relevant assignments of error.
Following his arrest, Mr. Draper was arraigned on June 23, 2000, and counsel was appointed to represent him. A $50,000 surety bond was set. Mr. Draper was unable to post the bond and, therefore, he remained in custody.
The case was originally scheduled for trial on August 3, 2000. Both the defense and prosecution moved for that trial date to be reassigned to a later date. As a result, a second trial date of September 11, 2000 was set.
Mr. Draper began to file motions on his own behalf while his appointed counsel was pursuing discovery and filing motions on his client's behalf. One of trial counsel's motions requested that the charges be severed for trial.
On September 11, 2000, the trial court, on its own motion, continued the trial date to October 11, 2000. The entry journalizing the continuance indicates that the judge was in trial on another case. Mr. Draper signed a waiver of his speedy trial rights for the period of that continuance.
On September 20, 2000, defense counsel filed a notice of alibi on behalf of Mr. Draper. Counsel later filed an amended notice of alibi on October 10, 2000.
On October 11, 2000, the trial judge again continued the trial. The entry journalizing this continuance indicates that the judge was again in trial on another case, and that the judge's offer of seeking another judge to hear the case was declined by Mr. Draper. Mr. Draper did not expressly waive his speedy trial rights for the period of this continuance.
On October 25, 2000, the trial judge began overruling Mr. Draper's pro se motions.
The case ultimately proceeded to a jury trial on November 27, 2000, after the trial judge overruled the motion to sever the charges. On the morning of trial, the court also overruled an oral motion asking that Mr. Draper be discharged for an alleged violation of his speedy trial rights pursuant to R.C. 2945.71 et seq.
On the same date, the prosecution moved to amend the arson charge from a felony to a misdemeanor. The motion was granted.
The jury ultimately convicted Mr. Draper of two counts of aggravated arson, first and second degree felonies, respectively, and the misdemeanor arson charge. The jury acquitted him of two remaining counts of aggravated arson. A presentence investigation was ordered and sentencing was scheduled for January 26, 2001.
Pursuant to an entry journalized January 29, 2001, the trial judge sentenced Mr. Draper to the following terms of incarceration: six years for the first-degree felony; four years for the second-degree felony; and, six months for the misdemeanor. All sentences were ordered to be served concurrently. The trial court also ordered Mr. Draper to pay restitution in the amount of $18,000 to Catholic Social Services, which partly subsidized an apartment which was the subject of one of the arson charges. Finally, the trial court appointed new counsel to represent Mr. Draper on appeal.
Counsel for Eldon G. Draper has timely appealed, assigning five errors for our consideration:
 I. The trial court erred to the prejudice of defendant-appellant in denying his motion to dismiss under R.C. 2945.73 for the failure of the state to bring him to trial within the time limits stated in R.C. 2945.71.
 II. The trial court erred in denying the motion of the defendant-appellant for severance of the counts of the indictment.
 III. The defendant-appellant was denied effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution.
 IV. The verdict is against the manifest weight of the evidence in accordance with the due process and equal protection provisions of the United States and the Ohio Constitutions.
 V. The verdict is not supported by sufficient probative evidence in accordance with the due process and equal protection provisions of the United States and the Ohio Constitutions.
Since Eldon Draper's (hereinafter "appellant") fourth and fifth assignments of error require a review and recitation of the facts as adduced at trial, we address them first and jointly.
Preliminarily, we set forth the similar, yet distinct, standards by which we are bound in reviewing these assignments of error, which challenge both the sufficiency of the evidence, and the manifest weight of the evidence.
"The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. In Thompkins, the court explained at length the distinctions between the two standards:
 With respect to sufficiency of the evidence, '"sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486 * * *. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, * * * citing Jackson v. Virginia (1979), 443 U.S. 307 * * *.
When reviewing the sufficiency of the evidence to support a conviction, an appellate court must review the record to determine "whether the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. In Jenks, the Supreme Court set forth the stringent standard of review to be applied in a sufficiency analysis:
 "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
In contrast, as explained in Thompkins, supra, a manifest weight analysis is slightly different:
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487 * * *. Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a '"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42 * * *. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175 * * * (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.').
Pursuant to the foregoing standards, we examine the record in a light most favorable to the prosecution to determine if the prosecution sufficiently proved beyond a reasonable doubt each element of the offenses charged, and/or whether the jury "lost its way" in convicting appellant such that a manifest miscarriage of justice occurred.
Returning now to appellant's fourth and fifth assignments of error, he contends that the prosecution failed to prove by sufficient evidence the elements of the offenses of which he was convicted, aggravated arson and arson. As indicated infra, appellant further contends that the verdicts were against the manifest weight of the evidence.
In pertinent part, aggravated arson is proscribed by R.C. 2909.02 as follows:
 (A) No person, by means of fire or explosion, shall knowingly do any of the following:
 (1) Create a substantial risk of serious physical harm to any person other than the offender;
(2) Cause physical harm to any occupied structure[.]
A violation of division (A)(1) is a first-degree felony; violating (A)(2) is a second-degree felony. R.C. 2909.02(B).
The relevant elements of the lesser offense of arson are set forth in R.C. 2909.03:
 (A) No person, by means of fire or explosion, shall knowingly do any of the following:
 (1) Cause, or create a substantial risk of, physical harm to any property of another without the other person's consent [.]
While this type of arson is typically a first-degree misdemeanor, the indictment alleged that the value of the harmed property was "five hundred dollars or more," thereby enhancing the offense to a fourth-degree felony. See R.C. 2909.03(B)(2)(b). However, as indicated infra, this arson charge was amended pretrial to a misdemeanor.
Applying the foregoing to the facts of this case, we turn now to the evidence adduced at trial.
Counts one and two of the indictment stemmed from the May 17, 1996 incident at a residence, an "occupied structure," located at 1460 Frebis Avenue, the home of Dixie Davis. Ms. Davis is the mother of Jeannette Davis, the "on-again, off-again" girlfriend of appellant. The remaining counts relate to the May 16, 2000 fire at Jeannette Davis's apartment at 202 Warren Street, and the damage inflicted on a motor vehicle owned by Maleigha Adams, a friend of Jeannette Davis.
Jeannette Davis testified on behalf of the prosecution. She met appellant in 1993 or 1994, when she was fourteen years old. She and appellant began dating a few months after they met. Appellant was twenty-one years old at the time.
Jeannette's mother, Dixie, did not approve of her young daughter's relationship with appellant. According to Jeannette, she was so infatuated with appellant that she became disobedient, and often ran away from home. Eventually, her mother filed criminal charges against appellant.
In May 1996, Jeannette ran away from home and went to Dayton, where appellant was living at the time. She had a falling-out with appellant, left him, and was eventually picked up as a runaway. Her mother picked her up and they returned to Columbus.
According to Jeannette, she and her mother were worried about appellant potentially retaliating against them after Jeannette left him. As a result, Jeannette, her sister, and her mother spent the night at a friend's home. On the morning of May 17, 1996, they learned that their Frebis Avenue home had been set on fire.
Jeannette and appellant did not see each other for a time; however, she began seeing him again in 1999. By that time, Jeannette had two children, and was living at 202 Warren Street in an apartment subsidized by Catholic Social Services. Although appellant was not living with them at the apartment, he came over often.
On an occasion when Jeannette had a male friend over at the apartment, appellant responded by breaking out some windows at the apartment.
Jeannette again spent time away from appellant. However, they again reconciled and she even stayed with him for awhile. Eventually, they moved back into the Warren Street apartment.
On the evening of May 14, 2000, Jeannette and appellant stayed at the home of her friend Maleigha Adams. The next morning, Jeannette and appellant had another argument, both verbal and physical; he grabbed her face and shoved her. Appellant and Ms. Adams also had an argument; appellant, clearly angry, left at approximately 2:00 or 3:00 p.m.
Jeannette Davis recalled that when she had left her apartment the day before, she left the apartment unlocked because she could not find her key.
Again in fear of appellant, Jeannette did not return to her apartment that day; she spent the night again with Maleigha Adams.
Jeannette testified that appellant knocked on Maleigha Adams's window at approximately 2:00 the following morning. He said, "`Jeannette, come outside. Your apartment is on fire. Someone set your apartment on fire. Come outside.'" (Tr. 53.) Jeannette did not go outside right away; instead, she learned from a phone call that her apartment had indeed been set on fire. When Jeannette started to leave Ms. Adams's apartment, appellant was still outside, standing by Ms. Adams's car. Jeannette called the police.
According to Jeannette, she and Maleigha Adams soon discovered that Adams's car had been vandalized. The registration and title were reduced to burnt ashes in the car and the stereo had been taken. In addition, spark plugs were removed so that the car would not start.
When Jeannette and Maleigha could finally get to Jeannette's apartment, they observed that the kitchen and downstairs had been heavily damaged. Jeannette described the damage:
 The kitchen was really horrible. It was all burned up. There was a lot of smoke damage. The downstairs, you couldn't go downstairs because it had burned up completely. The upstairs wasn't burnt, just very bad smoke damage. Nothing was left to take. [Tr. 57.]
Jeannette testified regarding a conversation she had with appellant the following day. According to Jeannette's testimony, appellant first denied starting the fire at the Warren Street apartment, but he admitted starting the 1996 fire to her mother's Frebis Avenue apartment. Jeannette described the following conversation which ensued between her and appellant regarding the fire at her mother's Frebis Avenue home:
 I told him * * * ["]I know you did the fire. You caught my mom's house on fire. I do know you did that.["] He said, ["]no, I didn't.["] I said, ["]yes, you did because when you busted the windows out, you came back the next night and set the curtains on fire.["] And he said, ["]no, I didn't, that's not how I did it.["]
* * *
 Basically, he told me he is telling me that he did it, but I was going about it wrong how he set the fire.
* * *
 He told me in my bedroom he put the curtains on fire. * * *
* * *
 * * * All I remember is he pulled the curtains out from the window in my room had already been broken, and he pulled the curtains out and set them on fire. He didn't say what he put on it to set the fire, but he said, "I pulled the curtains out and caught them on fire." [Tr. 63-64; emphasis added.]
Maleigha Adams's testimony was corroborative of Jeannette Davis's testimony. Ms. Adams consistently described the heated argument between appellant and Jeannette, and eventually Ms. Adams herself. Ms. Adams testified that she had to protect Jeannette from him with a knife. According to Ms. Adams, when appellant finally left, he threatened to do something to Jeannette's apartment.
According to Maleigha Adams, appellant returned later during the early morning hours and climbed up her fire escape. Appellant knocked on a window of her apartment and told Ms. Adams, "`Tell Jeannette her house is on fire. Her house is burning down,' or something like that." (Tr. 126.)
Maleigha Adams testified that she witnessed appellant get in her car, where he "mess[ed] with something." She then saw a flame burning from inside the car. At trial, Ms. Adams identified photographs of her car. Appellant ripped out her car stereo, and he burned her title and registration. Some carpet was also singed.
Dixie Davis testified regarding the tumultuous relationship between her daughter and appellant.
In 1995, while residing at the Frebis Avenue address, Dixie Davis initiated criminal charges against appellant for interference with custody and contributing to the unruliness of a minor. According to Ms. Davis, appellant threatened her at the courthouse, saying to her, "You're dead." On another occasion, appellant went to the Frebis Avenue address, ranted and raved outside, kicked in a window, and then threw a cement block through a storm door window. Windows were broken at the Davis residence on numerous occasions thereafter.
On the evening of May 16 or 17, 1996, someone set fire to the Davis residence.
Jeannette's brother Hugh Davis testified that he was at home alone when their home was set on fire. According to Hugh Davis, appellant had been nearby twice earlier the same day, slowly driving by the house.
Michael Madden, a fire investigator who responded to the Frebis Avenue fire, testified regarding his observations of May 17, 1996. When he arrived at approximately 3:30 a.m., the fire had already been extinguished. When he inspected the scene, he noted that several windows appeared to have been previously broken, as they were now covered with plywood and duct tape. The fire occurred near two windows of the house; the origin of both fires appeared to be the plywood panels duct-taped to the metal window frames. He testified that the cause of the fire was "direct flame impingement," the application of a lighter or match directly to the duct tape. He opined that the fire "* * * just took right off and burned, and then as soon as the duct tape was burned, the fire basically went out." (Tr. 216-217.) A plywood panel had fallen outside, but another panel fell inside; as a result, some fire damage to the curtains was caused. According to the investigator, the fires were not accidental; they were "incendiary," meaning "someone set it on fire." (Tr. 217.)
The state's next witness, Mimi Augustine, testified regarding the May 2000 incident at Jeannette Davis's home. Ms. Augustine resided at 200 Warren Street, next door to Jeannette Davis's apartment.
According to Ms. Augustine, during the early morning hours of May 16, she saw appellant pull up in a van in front of Jeannette's apartment. He got out of the van, knocked on the door of Jeannette's apartment, and then went in. He came back out quickly, got back into his vehicle, and drove away.
Ms. Augustine saw appellant return just a few minutes later. He pulled up and sat in his vehicle in front of Jeannette's apartment for a few minutes and then left again. Approximately ten minutes later, she heard Jeannette's fire alarm go off. When she went downstairs to find out what was happening, she smelled and saw smoke coming from Jeannette's apartment. Ms. Augustine called 911.
Lawrence Pfeifer was the final witness for the prosecution. A fire investigator for the City of Columbus, he responded to the fire scene at 202 Warren Street on May 16, 2000. By the time he arrived at approximately 1:00 a.m., the fire had been extinguished. He observed two areas of origination: one fire started in the kitchen and the second started in a pile of clothing on the basement floor.
Investigator Pfeifer opined that the fire emanating from the clothes pile was intentionally set. The kitchen fire emanated from foam cushions that had been stacked on top of the electric stove. Two of the stove's burners were in the "on" position, indicating that this fire too was intentionally started. He noted extensive smoke and "soot" damage to the apartment, "blistered" paint, and "charring" damage.
In addition to the extensive damage to Jeannette Davis's apartment, Pfeifer testified that the fire department had to ventilate neighboring apartments to which the smoke had spread. Finally, he testified that he was certain that the fire would have spread and caused even more damage had the fire department not extinguished it; in other words, the fire was "self-sustaining" in that it would not have simply gone out on its own.
As indicated infra, appellant's defense was an "alibi" defense, addressing only the May 2000 fire at Jeannette Davis's apartment. Appellant did not testify on his own behalf. He presented several witnesses who claimed that they were in his presence elsewhere at the time of the incident. A careful reading of the testimony of these witnesses reveals reasonable, and obviously effective, attacks on their credibility during cross-examination by the prosecution.
Robert Draper, appellant's father, was the first defense witness to testify. His testimony offered little of substance. On cross-examination, he essentially confirmed that his son was driving a van described by prosecution witnesses earlier during the state's case-in-chief.
Kalvin Clark was appellant's next witness, and offered little, if any, substantive testimony. Mr. Clark lived at 194 Warren Street in May 2000, and testified that he phoned appellant's stepbrother, Michael Harrell, on the night of the fire. According to Clark, he called Mr. Harrell because Mimi Augustine was claiming that appellant started the fire. On cross-examination, Mr. Clark admitted having been convicted of theft, sexual battery, receiving stolen property, and falsification. He also conceded that appellant's trial counsel told Clark that he (counsel) would obtain an extension on Clark's behalf to pay a fine on the falsification case.
Tyrone King testified that he was at a barbeque at Michael Harrell's house from approximately 6:00 p.m. until 2:00 a.m. on the date of the fire at Jeannette Davis's home. According to Mr. King, this was the same night that Harrell received a phone call about the fire. Mr. King testified that appellant was there at the time, the call coming around 12:30 or 1:00 a.m. Appellant did leave at approximately 1:00 a.m. to get some more beer.
On cross-examination, Mr. King claimed that he did not report any of this knowledge to the police because there were two active warrants for his own arrest at the time. However, even after the warrants were later resolved, Mr. King did not report the alibi information to the police.
Michael Harrell, appellant's stepbrother, also claimed that appellant was at the barbeque. Mr. Harrell testified that he did receive a phone call from Kalvin Clark shortly after 1:00 a.m., with Mr. Clark informing him that appellant had allegedly started a fire at Jeannette's apartment. According to Mr. Harrell, he thought Clark was joking because appellant was at Harrell's home at the time.
Mr. Harrell testified that he tried to contact the police with this alibi information; however, he hung up the phone because the person he spoke with was not helpful.
On cross-examination, Mr. Harrell, like defense witness Robert Draper, confirmed that appellant was driving the vehicle earlier described by prosecution witnesses. Mr. Harrell's testimony with respect to significant time frames involving appellant's whereabouts became entirely inconsistent under cross-examination.
Mr. Harrell acknowledged that he suffers from "delusional problems" for which he takes medication, and had difficulties with his memory. At the time of testifying, he was under a conditional release from a court-ordered hospitalization for his mental illness.
After considering all of the evidence, including that summarized above, the jury ultimately acquitted appellant of the arson to Dixie Davis's home in 1996, but found him guilty of the charges arising from the May 2000 fire at Jeannette Davis's home and to Maleigha Adams's vehicle.
Clearly the jury found the prosecution's witnesses, including arson experts, more credible than those of appellant who attempted to provide him an alibi for the arsons of which he was convicted. Such credibility determinations were properly resolved by the jury as the finder of fact and, accordingly, the jury acted well within in province in disbelieving appellant's witnesses. The jury's verdict is fully supported by the record.
Given the state of the record before us, appellant's convictions for aggravated arson and arson were supported by sufficient evidence. We also find that the convictions were not against the manifest weight of the evidence.
The fourth and fifth assignments of error are overruled.
Turning now to appellant's first assignment of error, he asserts that his speedy trial rights under R.C. 2945.71 et seq. were violated such that he should have been discharged prior to the commencement of trial.
R.C. 2945.71 requires that a defendant be brought to trial within 270 days of arrest or service of summons. Each day that a person is held in custody solely on the pending charge counts as three days of the 270-day period; accordingly, the basic requirement in appellant's case would have been that he be tried within ninety days of his arrest. Assuming he was arrested on the day he was indicted, the ninety-day period began to run on June 19, 2000.
The basic ninety-day period for trial set forth in R.C. 2945.71 is extended by several periods of time set forth in R.C. 2945.72. Specifically significant in this case are extensions pursuant to R.C.2945.72(D), (E), and (H). In relevant part, R.C. 2945.72 reads:
 The time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:
* * *
 (D) Any period of delay occasioned by the neglect or improper act of the accused;
 (E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;
* * *
 (H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion.
Counting the days from appellant's arrest on June 19, 2000 to his first trial date of August 3, 2000 shows that forty-five of his ninety days were used. The time from August 3, 2000 to September 11, 2000 does not count because that time was a continuance on the motion of the accused.
The time from September 11, 2000 to October 11, 2000 does not count because appellant expressly waived his speedy trial rights for that time period. Further, appellant and his counsel had not provided a notice of alibi, necessary for him to pursue an alibi defense. Thus, the period of the delay was occasioned by the neglect of the accused as set forth in R.C. 2945.72(D).
The period of delay from October 11, 2000 to November 27, 2000 was caused at least in part by trial counsel's being in another trial. While a delay of forty-seven days was not "necessitated" by the trial court's being in trial on this occasion, a delay of at least five days was necessitated. The five-day delay until the other trial was expected to be completed constituted a period of a "reasonable continuance granted other than upon the accused's own motion." R.C. 2945.72(H). Reducing the forty-seven days of the delay by these five days reduces the time of delay to forty-two days. Adding the forty-two days to the earlier forty-five days results in a total of at most eighty-seven of the ninety days for commencement of trial being used. Thus, appellant's right to a speedy trial pursuant to R.C. 2945.71 et seq. was not violated.
We acknowledge that more than five days of the forty-seven days may have been reasonable for a continuance, given appellant's unwillingness to have his case heard by another judge. However, we do not need to address this argument under these circumstances.
Based upon the foregoing, the first assignment of error is overruled.
By his second assignment of error, appellant's counsel asserts that the trial court erred in failing to sever for trial some of the arson charges from the other arson charges. This argument is without merit.
As set forth in detail above, all of the charges against appellant involved allegations that he damaged property of Jeannette Davis, appellant's on-again, off-again girlfriend, or property of persons close to Ms. Davis. Again, the first fire involved the property of Ms. Davis's mother, Dixie Davis. The second fire involved Jeannette Davis's apartment. The third fire occurred in an automobile owned by Jeannette's friend Maleigha Adams, who was helping to protect her friend Jeannette from appellant that very night.
The jury clearly had the ability sort out the evidence regarding the three incidents; it acquitted appellant of the charges related to the 1996 fire at Dixie Davis's residence, but it convicted him of the later fires at Jeannette Davis's apartment and to Ms. Adams's car.
In State v. Lott (1990), 51 Ohio St.3d 160, at 163, upon which the trial court below relied, the Supreme Court of Ohio held:
 The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged "are of the same or similar character." State v. Torres (1981), 66 Ohio St.2d 340 * * *. While joinder is a viable trial procedure, an accused may move to sever under Crim.R. 14 upon a showing of prejudice. For an appellate court to reverse a trial court ruling denying severance, the defendant must demonstrate that the trial court abused its discretion.
 "A defendant * * * under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial." State v. Torres, supra, at syllabus.
The Supreme Court of Ohio has upheld joinder of cases for trial with far fewer common facts and charges than are presented here. See, e.g., State v. Waddy (1992), 63 Ohio St.3d 424.
Given the foregoing standards, we can find no abuse of discretion by the trial court in the joinder of these charges for trial.
The second assignment of error is overruled.
In his third assignment of error, appellant's counsel asserts that appellant's trial counsel rendered ineffective assistance. We disagree.
The well-established standard for determining when an attorney has provided ineffective assistance of counsel was promulgated by the United States Supreme Court in Strickland v. Washington (1984), 466 U.S. 668. In State v. Hartman (2001), 93 Ohio St.3d 274, the Supreme Court of Ohio recently reiterated the firmly-rooted Strickland standard:
 * * * Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.
See, also, Lott, supra; and, State v. Williams (1988), 38 Ohio St.3d 346.
After a thorough review of the record, we cannot determine that appellant has demonstrated a deficient performance by trial counsel; therefore, appellant necessarily cannot demonstrate resulting prejudice.
The third assignment of error is overruled.
In addition to appellate counsel's arguments filed on behalf of Mr. Draper, appellant himself has filed a "Supplemental Brief in Pro Se Capacity." In his "supplemental brief," he places before us two additional assignments of error which he asks us to consider. The proposed "supplemental" assignments of error are:
ASSIGNMENT OF ERROR NO. VI:
 TRIAL COURT ERRED AS A MATTER OF LAW ALLOWING PERJURED TESTIMONY ON THE RECORD PURSUANT TO OHIO REVISED CODE § 2921.11(B), CONSTITUTED PLAIN ERROR ON THE FACE OF THE RECORD PURSUANT TO OHIO CRIMINAL RULE 52(B).
ASSIGNMENT OF ERROR NO. VII:
 THE TRIAL COURT ABUSED ITS DISCRETION THEREBY DENYING APPELLANT DUE PROCESS AND FUNDAMENTAL FAIRNESS WHEN IT DENIED APPELLANT'S [ORAL MOTION FOR ACQUITTAL] PURSUANT TO OHIO RULES OF CRIMINAL PROCEDURE RULE 29 AND COMMITTED PLAIN ERROR ON THE FACE OF THE RECORD PURSUANT TO OHIO CRIMINAL RULE 52(B).
We are not required to address either of these proposed "supplemental" assignments of error, as appellant has assigned appellate counsel who has sufficiently briefed the issues potentially worthy of consideration on appeal. We note, however, that the record before us, as carefully considered above, does not indicate the presence of perjured testimony.
Finally, we also note that in order for a Crim.R. 29 motion to be sustained, the evidence would have to be insufficient, as a matter of law, to sustain a conviction. Again, we have thoroughly addressed the sufficiency of the evidence.
In summary, the five assignments of error which are properly before this court are overruled. Accordingly, the judgment of the trial court is affirmed.
Judgment affirmed.
PETREE, J., and BRYANT, P.J., concur.